**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

GERARDO GUERRERO, JR.,        :
  Plaintiff,        :
               :
v.        :        Civil No. 3:01CV1278(AVC)
               :
STATE OF CONNECTICUT        :
DEPARTMENT OF CHILDREN AND        :
FAMILIES,        :
  Defendant.        :

## RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This is an action for damages brought by Gerardo Guerrero pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, as amended by the Civil Rights Act of 1991 (Title VII). The defendant, the State of Connecticut Department of Children and Families ("DCF"), has filed the within motion for summary judgment (document no. 38) pursuant to Fed. R. Civ. P. 56, contending that there is no genuine issue of fact and that it is entitled to judgment as a matter of law.

The issues presented are: (1) whether Guerrero has raised a genuine issue of fact that the defendant discriminated against him in his employment on account of his race; and (2) whether Guerrero has raised an issue of fact that the conduct which serves as the basis for his hostile work environment cause of action was directed at him because of his race.

For the reasons that hereinafter follow, the court concludes that: (1) Guerrero has failed to raise an issue of fact that the defendant discriminated against him on account of his race; and (2) Guerrero has failed to raise an issue of fact that the

conduct which serves as the basis for his hostile work
environment cause of action was directed at him because of his
race.

The motion for summary judgment (document no 38) is
therefore GRANTED.

### **FACTS:**

Examination of the complaint, Local Rule 56(a) statements,
exhibits, motion for summary judgment, and the responses thereto
reveals the following undisputed, material facts:

At all relevant times, Gerardo Guerrero, a black male, was
employed by the Connecticut Department of Children and Families
("DCF").  The terms of Guerrero's employment with the DCF were
governed by a collective bargaining agreement ("CBA").  Under the
CBA, employees could only be discharged, demoted or suspended for
"just cause."  Guerrero initially held the position of social
worker trainee.  On May 21, 1996, during his tenure as a social
worker trainee, Guerrero's then-supervisor, Shirley DeFlavis,
gave Guerrero "an official letter of warning regarding
deficiencies in [his] work performance in the areas of
cooperation, judgment, neglect of duty, and ability to learn new
duties."

In June 1997, DCF personnel promoted Guerroro to the
position of social worker and transferred him to the DCF
"Hotline" division.  At the time of his promotion, Guerrero

2

received an employment evaluation of satisfactory.  The Hotline
is a twenty-four-hour-a-day, three-hundred-and-sixty-five-day-a-
year, DCF program that serves, primarily, as the central point
for the reception of all telephone calls and written
communications alleging child abuse and neglect.[1]  The Hotline is
staffed by three shifts of social workers.  Calls are received by
DCF social workers who ask relevant and detailed questions and
subsequently enter the information into the DCF database, which
is known as LINK.

All calls that relate to abuse or neglect must be entered
into LINK.  Based on the data entered by the social worker, LINK
generates a response time that corresponds with the relevant risk
assessment.  This information is then reviewed by the Hotline
supervisor and, if necessary, transmitted to the appropriate
regional office for investigation.  Although LINK makes the
relevant calculations regarding risk assessment, the social
worker's judgment in asking the right questions, in the right
manner, is nevertheless important in ascertaining the correct
information.  Failure to ask the right questions in the right
manner, or failure to enter the information into LINK, may
potentially result in putting a child at risk of fatal harm.
Additionally, because the Hotline is the main point of contact

---

[1]The Hotline also: (1) conducts background checks on prospective
employees that want to work with children; and (2) investigates
reports on DCF licensed providers through a special unit.

3

between the public and the DCF, positive public relations and customer service are top priorities. Consequently, all social workers who are assigned to the Hotline receive enhanced training regarding asking the right questions, assessing the need for asking additional questions, and evaluating the thoroughness of their report. Guerrero received such training, and, in fact, characterized the training he received as "excellent."

On March 23, 1997, Guerrero received written and oral counseling from his supervisor in connection with certain deficiencies regarding his assessment of a caller's allegations of abuse and neglect, and the time he spent on each call. On August 19, 1997, Guerrero received written and oral counseling in connection with a complaint made by a caller who had dealt with Guerrero. The caller, a mandated reporter, complained that Guerrero was reluctant to report a claim of abuse because the children were living safely with their aunt. The caller also expressed concern regarding Guerrero's attitude and demeanor during the call. On August 23, 1997, Guerrero again received written and oral counseling in connection with his report taking process and intake protocol. More specifically, Guerrero was counseled regarding the proper questions to ask to elicit helpful and necessary information.

On May 11, 1998, DCF personnel held a meeting with Guerrero to discuss two separate complaints received in connection with

two separate calls.  Both callers complained of Guerrero's lack
of empathy and the fact that he was unhelpful.  In fact,
according to one caller, Guerrero was so unhelpful that she hung
up in hopes of calling back and speaking with a different social
worker.  A review of the tape recordings of the calls indicated
that, during one call Guerrero had inadvertently revealed
confidential information, and that in both calls he had
inappropriately told the callers to call the police before
getting all pertinent information.  Additionally, Guerrero had
failed to log either call into the LINK system.  Guerrero's
supervisor counseled him regarding his deficiencies and once
again reviewed the proper procedures with him.  The notes from
the meeting indicate that Guerrero was informed that failure to
log calls into the system in the future "will result in more
formal action and will be considered a performance issue and
[will be] addressed in worker's evaluation."

     In June of 1998, one Kenneth Mysogland became the Program
Director for the Hotline.  Mysogland's superior gave him a
mandate to clean up the poor perception of the Hotline and raise
its level of performance.  Prior to Mysogland's arrival, the
consensus was that: (1) "the [Hotline] reports were not
thorough"; (2) "the proper questions were not [being] asked"; and
(3) "there was a perception that the Hotline staff were not
appropriate and were not polite and empathetic while answering

5

telephone calls." According to Mysogland, Guerrero was part of
the problem inasmuch as the complaints lodged against him
reflected the poor perception of the Hotline.

Soon after his arrival at the Hotline, Mysogland held four
supervisory meetings. Guerrero attended two of these meetings.
At the meetings, Mysogland emphasized the fact that social
workers are often the first point of contact with the public and
thus must make a good impression. Mysogland impressed upon the
social workers that they were to provide a "responsive,
articulate and thorough service to the public and agency." Also,
Mysogland reiterated that all calls were to be entered into the
LINK system, even those which the social workers believed did not
meet the legal standard of abuse and neglect. Mysogland repeated
his admonitions at a December 1998 meeting, in a spring 1999
email, and at staff meetings in the fall of 1999.

On August 23, 1998, the Hotline received another complaint
regarding Guerrero's interaction with a caller. The caller
complained that, she "did enjoy speaking with [Guerrero] . . .
and at times he was rude and not helpful from where I was coming
from."

On April 20, 1999, Guerrero received a call while working at
the Hotline. The caller, a nurse, sought to have a child placed
in DCF custody because her mother had recently been admitted to
the hospital. The caller subsequently complained to DCF

personnel that "Guerrero was not responsive and did not understand the significance of the information that she was conveying." Guerrero did not document the call. Because the Guerrero did not enter the information into the LINK system, the DCF took no action. The hospital was therefore forced to make its own plans for the child.

Also on April 20, 1999, Guerrero received a phone call from someone who stated that he had overheard a child being beaten in the home next door. Guerrero told the caller to contact the police. Guerrero failed to get the caller's name, address, or other identifying information. Obtaining such information is standard Hotline Procedure. Guerrero once again failed to enter a record of the call into the LINK system. Because the caller never contacted the police and because Guerrero did not log the call into LINK, DCF never investigated the allegation of abuse. On May 26, 1999, Mysogland commenced an internal DCF investigation regarding the April 20, 1999 calls.

On June 13, 1999, during the pendency of the investigation, Guerrero, who was aware of the ongoing investigation, received a call from an individual who was concerned that his children were being abused. Guerrero once again failed to document the call by entering a record of the call into the LINK system. He also failed to ask the caller his name, get the name of the children, or obtain the caller's phone number, all in contravention of

7

settled DCF policy.

In June of 1999, Mysogland reassigned Guerrero to the first shift to perform various computer searches.  The reassignment was in lieu of administrative leave during the pendency of the investigation of the April 20, 1999 calls and the June 13, 1999 call.  On July 19, 1999, following a hearing where Guerrero had union representation, the DCF suspended Guerrero for ten days for his actions with regard to the April 20, 1999 calls and the June 13, 1999 call.  The specific grounds for his suspension were "neglect of duty" and "engaging in . . . activities detrimental to the best interest of the agency."  The letter informing Guerrero of his suspension stated that "this letter should . . . be taken as a warning that future similar actions may lead to further disciplinary actions up to and including dismissal."

On July 22, 1999, Guerrero filed a union grievance with regard to his reassignment to the first shift and his ten day suspension.  On September 29, 1999, the union upheld Guerrero's grievance regarding his reassignment.  The union subsequently submitted the ten day suspension grievance to arbitration.  The arbitrator held that the DCF had "just cause" to impose the ten day suspension.  Specifically, the arbitrator found that, "while a ten day suspension, in other circumstances, may seem excessive for a first or second disciplinary action, given the history of this particular grievant, the repeated clear notice, and the

8

occurrence of a second infraction while disciplinary action was
pending for the first one, it was not unreasonable to impose this
penalty for neglect of duty."  Rejecting Guerrero's claim of
disparate treatment, the arbitrator found that:

> [T]he evidence is that the [DCF] . . . made numerous efforts
> to help Guerrero before imposing serious disciplinary action.
> It invoked discipline only after years of trying less formal
> alternatives, and not obtaining a positive result.  The few
> specific instances cited by the union, in which others failed
> to document calls, had legitimate explanations and were not
> equivalent to Guerrero's failings.  Nor is there evidence that
> these other social workers received the same kind of
> counseling and notice as did Mr. Guerrero.  Thus, I do not
> find that he was a victim of disparate treatment.

On September 29, 1999, in a formal performance appraisal,
DCF personnell wrote that Guerrero's judgment was "poor and
unreliable" and that his work was "often unacceptable with
frequent errors or rejections."  Although other areas of
Guerrero's performance were acceptable, he received an overall
evaluation of "unsatisfactory."

On February 20, 2000, Pam Burritt, Guerrero's supervisor,
received a complaint from a caller who complained that she did
not feel that Guerrero took her complaints seriously and that his
demeanor was rude.  DCF held a hearing in connection with this
complaint and subsequently suspended Guerrero for thirty days
based on, inter alia, his: (1) "offensive and abusive conduct
towards the public"; (2) "neglect of duty"; and (3) "engaging in
an activity that is detrimental to the best interests of the

agency."  Mysolgland sent Guerrero a letter notifying him of the
suspension, which stated: "This letter should also be taken as a
final warning that future violations of said policies and
regulations will result in dismissal."

On July 3, 2000, Guerrero returned to the Hotline after
serving his thirty day suspension.  That night Guerrero received
a call from a nurse requesting permission to treat a seventeen
year old boy who claimed to be under DCF jurisdiction.  The
nurse apparently gave Guerrero the wrong name and Guerrero, based
on the miscommunication of the name, accessed a file for a four
year old boy.  Relying on the information contained within the
file for the four year old boy, Guerrero informed the nurse that
the child was no longer in DCF custody.  The nurse called back
later and spoke with another social worker.  This social worker
located the proper file in the LINK system.  The nurse
subsequently lodged a complaint with the DCF, contending that
Guerrero's manner was offensive and frustrating.  On September
11, 2000, following a hearing, the DCF terminated Guerrero's
employment based on the July 3, 2000 phone call and Guerrero's
past discipline.  The union represented Guerrero at the hearing.
With regard to the July 3, 2000 phone call, the letter of
termination indicated that Guerrero's actions were in violation
of various regulations governing "neglect of duty."

Guerrero filed union grievances with regard to the thirty

10

day suspension and his termination.  The grievances were denied
and the matters were submitted for arbitration.  On August 8,
2001, the arbitrator found that the both the suspension and
termination were supported by just cause.  Specifically, the
arbitrator found "that these are cases of continued neglect of
duty and apparent inability to perform the job in a satisfactory
manner, which constitute just cause for suspension and
termination."

On July 5, 2001, Guerrero filed the present action alleging
employment discrimination.  Specifically, Guerrero alleges that
DCF personnel discriminated against him on the basis of his race
when they suspended him and when they discharged him.  Guerrero
further alleges that DCF personnel cultivated a racially hostile
work environment.

<b><u>STANDARD</u>:</b>

On a motion for summary judgment, the burden is on the
moving party to establish that there are no genuine issues of
material fact in dispute, and that it is entitled to judgment as
a matter of law.  <u>See</u> Fed. R. Civ. P. 56(c); <u>Anderson v. Liberty
Lobby, Inc.</u>, 477 U.S. 242, 256 (1986).  A dispute regarding a
material fact is genuine "'if the evidence is such that a
reasonable jury could return a verdict for the nonmoving party.'"
<u>Aldrich v. Randolph Cent. Sch. Dist.</u>, 963 F.2d 520, 523 (2d
Cir.), <u>cert. denied</u>, 506 U.S. 965 (1992) (quoting <u>Anderson</u>, 477

11

U.S. at 248).  The court resolves "all ambiguities and draw[s] all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide."  Aldrich, 963 F.2d at 523.  Thus, "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir.), cert. denied, 502 U.S. 849 (1991).

## DISCUSSION:

1.    Title VII: Disparate Treatment Claim

The DCF first contends that the summary judgment should be granted because Guerrero has failed to raise an issue of fact that he was terminated on the basis of his race.  Specifically, DCF contends that Guerrero "has failed to offer any credible evidence to counter the [DCF's] . . . legitimate non-discriminatory reasons for terminating [Guerrero.]  Without adequate evidence of pretext, [Guerrero] cannot sustain his burden as a matter of law."

Guerrero responds that "viewing the record in the light most favorable to Guerrero, there is sufficient evidence in the record to establish pretext."

A Title VII cause of action alleging employment discrimination proceeds under the burden shifting analysis of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct 1817, 36L.Ed.2d 668 (1973).  Under that framework, the plaintiff must

12

first establish a prima facie case of discrimination.  This
requires that "the claimant . . . show that: 1) he belonged to a
protected class; 2) he was qualified for the position; 3) he
suffered an adverse employment action; and 4) the adverse
employment action occurred under circumstances giving rise to an
inference of discriminatory intent."  <u>Terry v. Ashcroft</u>, 336 F.3d
128, 138 (2d Cir. 2003).  With regard to the prima facie case,
the plaintiff's burden is <u>de minimis</u>.  <u>See Dister v. Continental
Group, Inc.</u>, 859 F.2d 1108, 1114 (2d Cir. 1988).

"Once a plaintiff has established a prima facie case, the
burden shifts to the defendant, which is required to offer a
legitimate, non-discriminatory rationale for its actions."  <u>Terry
v. Ashcroft</u>, 336 F.3d 128, 138 (2d Cir. 2003).  Finally, "[i]f
the defendant proffers such a [legitimate, non-discriminatory]
reason, the presumption of discrimination created by the prima
facie case drops out of the analysis, and the defendant will be
entitled to summary judgment . . . unless the plaintiff can point
to evidence that reasonably supports a finding of prohibited
discrimination. . . . The plaintiff must be afforded the
opportunity to prove by a preponderance of the evidence that the
legitimate reasons offered by the defendant were not its true
reasons but were a pretext for discrimination."  <u>Mario v. P & C
Food Markets, Inc.</u>, 313 F.3d 758, 767 (2d Cir. 2002) (internal
quotation marks and citations omitted).  In other words, "to

13

defeat summary judgment . . . the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." Terry v. Ashcroft, 336 F.3d 128, 138 (2d Cir. 2003) (internal quotation marks omitted).

Applying these principles, the court concludes that summary judgment should be granted in favor of the defendant. Although there is considerable question regarding whether Guerrero can establish a prima facie case, the court need not address this issue, because, even if the court were to assume that Guerrero could establish a prima facie case, summary judgment is nonetheless proper because Guerrero has failed to present any evidence that the defendant's legitimate, non-discriminatory reason for his termination and suspensions was a pretext for discrimination.[2] Guerrero contends that the DCF suspended and terminated him because of his race. The defendant, however, asserts that Guerrero was suspended and fired because of his chronically poor employment record. A review of the record

_____

[2]Specifically, with regard to Guerrero's prima facie case, the claim that he was qualified for his position is, at best, doubtful. The evidence clearly indicates that, at the time of his termination, Guerrero's performance was poor and that his most recent evaluation indicated that his work was unsatisfactory. See McLee v. Chrysler Corp., 109 F.3d 130, 135 (2d Cir. 1997) (plaintiff could not satisfy even minimal prima facie burden where an undisputed pre-termination job evaluation clearly indicated that for race neutral reasons plaintiff's job performance was unsatisfactory). Nevertheless, as discussed above, the court does not address this issue.

14

indicates considerable support for the defendant's claim.  First,
it is undisputed that in the months and years prior to his
suspensions and termination, Guerrero had repeatedly received
counseling and warnings regarding the fact that his work
performance was not satisfactory.  Indeed, as early as 1996,
Guerrero's supervisor noted certain deficiencies in his work.
Moreover, at least eight complaints were lodged against Guerrero
during the time that he worked at the Hotline, and, as Guerrero
admits, all of them were substantiated.

More importantly, an independent arbitrator found that with
regard to the Guerrero's two suspensions, as well as his ultimate
termination, the DCF had just cause for its actions.  Put simply,
independent arbitrators concluded that Guerrero's poor work
performance warranted his suspensions and dismissal.  Guerrero's
"termination occurred, therefore, only after a decision, based on
substantial evidence, of an undisputedly independent, neutral,
and unbiased adjudicator that had the power to prevent the
termination.  *This fact is highly probative of the absence of
discriminatory intent in that termination.*"  Collins v. New York
City Transit Authority, 305 F.3d 113, 119 (2d. Cir. 2002)
(emphasis added).  Thus, to survive summary judgment, Guerrero
"must present strong evidence that the decision was wrong as a
matter of fact – e.g. new evidence not before the tribunal – or
that the impartiality of the proceeding was somehow compromised."

Collins v. New York City Transit Authority, 305 F.3d 113, 119
(2d. Cir. 2002).

Guerrero, however, does not challenge the arbitrator's
impartiality or the fairness of the arbitration proceeding.
Indeed, Guerrero's memorandum fails to address the arbitrator's
conclusions in any substantive manner.  Rather, Guerrero raises
essentially three arguments in an attempt to call into doubt the
defendant's proffered reasons for his suspensions and
termination.  None of them are persuasive.  First, Guerrero
contends that, contrary to the DCF's contention and the
arbitrators' findings, his work performance was satisfactory.  In
support of this contention, Guerrero relies on Mysogland's
deposition testimony where he states that in 1998 Guerrero's
performance, though not without "issues", did not "rise to the
overall level of unsatisfactory" and therefore could be
characterized as satisfactory.  Although Mysogland did make this
statement, in the same deposition, Mysolgland characterizes
Guerrero's job performance in 1999 and 2000 as unsatisfactory.
Of course, 1999 and 2000 is the relevant time period inasmuch as
the suspensions and terminations – the conduct that Guerrero
claims is actionable – occurred during that time.  Accordingly,
Guerrero's reliance on the 1998 evaluation is unavailing.  See
Leffel v. Valley Financial Services, 113 F.3d 787, 794-95 (7th
Cir. 1997) (satisfactory reviews received previously do not call

into question the subsequent criticisms that culminated in discharge).

Second, Guerrero asserts that other DCF employees were treated differently than he was. Specifically, Guerrero contends that a white "comparator was terminated but then reinstated to employment via a transfer."[3] Although dissimilar treatment of similarly situated employees can serve as evidence that an employer's legitimate, non-discriminatory reason for an adverse employment action was a pretext for discrimination, see Graham v. Long Island R.R., 230 F.3d 34, 43 (2d Cir. 2000), the employees to be compared must be similarly situated in all material respects. See Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000). Determination of whether the employees are similarly situated in all material respects "must be judged based on (1) whether the plaintiff and those he maintains were similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness." Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000).

Under this standard, Guerrero is not similarly situated to

---

[3]Guerrero also claims that his "termination was the only termination that remained as such, . . . [t]he other terminations were eventually reduced to reinstatements with suspensions." Guerrero, however, fails to provide any evidentiary support for this claim. The court therefore does not consider this contention. See Byrnie v. Town of Cromwell Board of Educ., 243 F.3d 93, 101 (2d Cir. 2001) ("non-moving party may not rely on conclusory allegations or unsubstantiated speculation").

the comparator.  Put simply, the comparator did not have the
history of past disciplinary problems that Guerrero had.  In
fact, the comparator's termination was a result of her first
offense.  Guerrero, on the other hand, had received at least four
oral and written counseling sessions, a ten day suspension, and a
thirty day suspension before he was ultimately terminated.  Thus,
Guerrero is dissimilar from the comparator based on the fact that
his disciplinary record is far worse than that of the comparator.
See Maniccia v. Brown, 171 F.3d 1364, 1369 (11th Cir. 1999)
(concluding that plaintiff was not similarly situated to
comparator because, in part, comparator had not committed the
same number of policy violations); Plair v. E.J. Brach & Sons,
Inc., 105 F.3d 343, 349 n.3 (7th Cir. 1997) (same).

Finally, Guerrero challenges DCF's legitimate non-
discriminatory reasons for his termination by noting that there
were other methods of less drastic discipline, namely so-called
"last chance agreements" and additional training.  Last chance
agreements are options in lieu of termination, negotiated through
an informal process between the union and the state agency.  Such
arrangements are initiated by the union and require an admission
of wrongdoing on the part of the accused and a commitment to
follow DCF policies in the future.[4]  Guerrero, however, failed to

---

[4]Relying on a citation to the arbitrator's opinion, Guerrero
contends that this is not the case.  The portion of the arbitrator's
opinion cited by Guerrero, however, has absolutely nothing to do with
last chance agreements.  Having reviewed the entire arbitrator's

admit any wrongdoing with regard to the conduct underlying his
thirty day suspension and termination, and the union never
initiated any such negotiations on his behalf.  Thus, contrary to
Guerrero's assertion, a last chance agreement was not an option
in this case.

Nevertheless, putting aside the question of whether such
lesser forms of discipline were available, Guerrero fails to
articulate the any relevant inference to be drawn from the fact
that the DCF had less severe forms of discipline available, but
choose not to use them.  The court will not ascribe
discriminatory intent to an employer's choice of disciplinary
methods based solely on the fact that there were less severe
methods of discipline available.  Such a conclusion would
essentially render every termination discriminatory inasmuch as
there is likely always a less severe method of discipline than
that of termination.  Additionally, to the extent that Guerrero
contends that the mere availability of lesser forms of disciple
indicates that he was treated differently than others, Guerrero
does not identify a case where such lesser forms of discipline
were employed in a situation that is similar in all material
respects to his case.

The court therefore concludes that Guerrero has failed to

---

opinion, the court cannot identify anything that remotely supports
Guerrero's contention; the court therefore rejects Guerrero's denial.

19

satisfy the burden of proving pretextual discrimination where, as here, there is overwhelming evidence to support the DCF's legitimate business reasons for the termination and suspensions. Accordingly, summary judgment is granted with respect to the Title VII disparate treatment cause of action.[5]

2.    Title VII: Hostile Work Environment

DCF next contends that summary judgment should be granted in its favor with regard to Guerrero's hostile work environment claim.  Specifically, DCF contends that Guerrero's hostile work environment is flawed because: (1) "what [Guerrero] alleges to be harrassment is in reality a group of discrete acts"; and (2) "there simply is no evidence that the acts complained of by [Guerrero] . . . as harassing were motivated by his race."

Guerrero responds that "[i]n the aggregate, Guerrero was subjected to excessive scrutiny concerning his performance as a Hotline worker."

"[S]urvivng summary judgment on a hostile environment claim under [Title VII] . . . requires evidence not only that the victim subjectively perceived the environment to be hostile or abusive, but also that the environment was objectively hostile and abusive, that is, that it was permeated with discriminatory

---

[5]DCF also contends that summary judgment should be granted because: (1) Guerrero was not qualified to retain his position; and (2) Guerrero's termination did not occur in such a manner as to give rise to an inference of discrimination.  Having concluded that judgment is warranted on other grounds, the court need not reach these issues.

intimidation, ridicule, and insult, . . . that is sufficiently
severe or pervasive to alter the conditions" of the plaintiff's
employment. Hayut v. State University of New York, 352 F.3d 733,
745 (2d Cir. 2003) (internal quotation marks omitted). The
determination of whether an environment was hostile, "entails
examining the totality of the circumstances, including: the
frequency of the discriminatory conduct; its severity; whether it
is physically threatening or humiliating, or a mere offensive
utterance; and whether it unreasonably interferes with" the
victim's employment. Hayut v. State University of New York, 352
F.3d 733, 745 (2d Cir. 2003) (internal quotation marks omitted).
Moreover, a plaintiff raising a "Title VII hostile environment
claim . . . must produce evidence that she was discriminated
against because of her race . . . ." Richardson v. New York
State Dept. of Correctional Service, 180 F.3d 426, 440 (2d Cir.
1999).

Applying these principles, the court concludes that Guerrero
has failed to raise an issue of fact with regard to his hostile
work environment claim. Guerrero does not claim any type of
improper remark, racial slur, threatening comment, or physical
abuse as the basis of his claim. Rather, the gravaman of
Guerrero's claim is that his work environment was hostile because
he was subject to excessive scrutiny concerning his performance
at the Hotline. In other words, the conduct that Guerrero

21

alleges as hostile is the various discipline he suffered as result of his poor performance. Guerrero, however, fails to provide any evidence sufficient to raise a question of fact that such discipline was undertaken because of his race. The only evidence that Guerrero cites to is the alleged "uneven application of DCF's disciplinary policy." The court has previously concluded, however, that there was no such uneven application of the disciplinary policy because Guerrero was not similarly situated to the comparators. Thus, the record is devoid of any evidence that he was discriminated against on the basis of his race, and, therefore, judgment should be granted in DCF's favor.

### CONCLUSION

For the foregoing reasons, the motion for summary judgment (document no. 38) is GRANTED.

It is so ordered this __*ATW*__ day of March, 2004 at Hartford, Connecticut.

Alfred V. Covello
United States District Judge